(Reap. Dec. 10223)

MILTON L. MINTZER *v.* UNITED STATES

Entry No. 714567, etc.

(Decided April 11, 1962)

*James J. Morrison* for the plaintiff.

*William H. Orrick, Jr.,* Assistant Attorney General (*Daniel I. Auster,* trial attorney), for the defendant.

RAO, Judge: The 12 appeals for reappraisement here involved have been consolidated for purposes of trial. They relate to several importations from Mexico of unoiled sisal twine and rope, varying in

ply, diameter, and fineness. This merchandise was entered at the port of New York at the invoiced unit prices, less nondutiable charges which are not in issue. The appraiser advanced the unit values.

Although no brief has been filed on behalf of the importer, it appears from the record in the case, and from defendant's brief, that both parties rely upon statutory export value, as defined in section 402(d) of the Tariff Act of 1930, as the proper basis for the determination of the value of the merchandise covered by these appeals for reappraisement. Export value is defined in said section 402(d) as follows:

The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

There is no material dispute over the facts and circumstances surrounding the sale to the importer of the merchandise at bar. The record establishes that it was manufactured in Merida, Yucatan, Mexico, by a cordage mill, operating under the name of Cordeleria de San Juan, S.A., and exported to the United States during the period between February 23, 1954, and July 20, 1954, and that the invoice prices were the freely offered prices to all purchasers for exportation to continental United States.

The proof also shows that Cordeleria de San Juan, S.A., was a member of a Mexican cordage association, known as Cordeleros de Mexico, to which most, if not all, Mexican cordage manufacturers belonged. The association from time to time published extracts from the minutes of its meetings in the form of circulars, which set forth the minimum prices its members might charge for cordage and twine of various specifications. Members of the association were required to adhere to the established prices or be "severely penalized."

Circulars embracing the period of exportation here involved have been introduced into evidence in their original Spanish versions, as exhibits attached to plaintiff's exhibit 2, an affidavit of Jose M. Castro, subdirector of Cordeleria de San Juan, S.A.; and in their English translation, as plaintiff's exhibit 3. They show that one set of prices was established for quotations to purchasers in the United States and in Canada, and another set, at higher rates, for sales in Central and South American markets, including Puerto Rico.

It further appears that, during the period of exportation of the merchandise at bar, Cordeleria de San Juan, S.A., fulfilled an order

for sisal twine and sisal rope from Ballester Hermanos, Inc., of San Juan, Puerto Rico, making partial shipments thereof in April, May, and June 1954. The prices therefor, which were higher than those for corresponding twines and ropes exported to the United States mainland, were adopted by the appraiser in making his returns of value for the subject merchandise. Apparently, the appraiser also used the list of prices for sales to Puerto Rico, in finding values for twine and rope of other specifications.

Plaintiff testified at the trial that, upon receipt of notices of appraisement at values in excess of the entered values, he communicated with the exporter who agreed to make no further sales to customers in Puerto Rico; and, in fact, it is shown that the one sale to Ballester Hermanos, Inc., in 1954, was the only sale made by the exporter to any purchaser in Puerto Rico since September 23, 1949, and that no other orders were received by the company from any Puerto Rican buyers until 1959.

However, the sale and shipments to Puerto Rico in 1954 are clearly established, as is the fact that other Mexican cordage mills manufacture twine of the same or similar type as that here involved. Whether they made sales to buyers in Puerto Rico during any period relevant to the present inquiry is not matter of record.

From the proof which has been introduced by the plaintiff, it is reasonable to state that he relies upon the quotations for exportation to the United States mainland, as evidenced by the invoiced unit prices, as representing the freely offered prices to all purchasers within the contemplation of the statutory definition of export value. It is the position of the defendant, however, that Puerto Rico is a part of the United States for tariff purposes especially and, hence, that no price which is withheld from Puerto Rican buyers can be considered to be a freely offered price to all purchasers in the United States.

The opposing contentions of the parties necessitate an initial determination of the status of Puerto Rico in relation to the States of the Union within the framework of the United States tariff structure. In this connection, the court is of opinion that it may judicially notice that, at the time of the enactment of the Tariff Act of 1930, the United States of America was a Federal Republic consisting of 48 states, the District of Columbia, the territories of Alaska and Hawaii; and the possessions of Puerto Rico, Guam, American Samoa, Virgin Islands, Panama Canal Zone, and the Philippine Islands. The tariff act itself defines the term "United States" as including "all Territories and possessions of the United States, except the Philippine Islands, the Virgin Islands, American Samoa, and the island of Guam (§ 401(k)); and there is also specified in section 1 of title I that "there shall be levied, collected, and paid upon all articles when imported from any foreign country into the United States or into any of its possessions

(except the Philippine Islands, the Virgin Islands, American Samoa, and the island of Guam) the rates of duty which are prescribed by the schedules and paragraphs of the dutiable list of this title, * * *."

Consequently, whether by definition or express inclusion, the provisions of the Tariff Act of 1930 extend to importations into Puerto Rico, and the term "United States," as used in section 402(d), *supra*, embraces the island of Puerto Rico. When, therefore, export value is stated to be the freely offered price to all purchasers, for exportation to the United States, price offerings to residents of Puerto Rico are properly to be considered as elements of such value.

The situation in the instant case is one in which the freely offered prices to all purchasers on the United States mainland differ from the freely offered prices to all purchasers in Puerto Rico, the former being the lower invoiced prices, the latter, the higher appraised values. Moreover, it may well be assumed that sales to continental United States predominated over sales to Puerto Rico. Which of the two sets of prices must be selected as establishing export value, depends, in the last analysis, upon the meaning of the expression "all purchasers" in the statutory definition of export value.

In the case of *United States* v. *American Glanzstoff Corp.*, 24 C.C.P.A. (Customs) 35, T.D. 48308, the court considered the words "all purchasers" in connection with a so-called loyalty discount allowed to all who purchased from a syndicate, but disallowed if purchases were made from nonmembers of the syndicate. Although it appeared that cancellation of the discount had never been necessitated, and most of the buyers of the involved class of goods dealt with the syndicate, the court held that the discount was not freely offered to "all purchasers," stating:

The first inquiry is: What was the price at the time of exportation, at which the imported merchandise was freely offered for sale to *all* purchasers in the principal markets of the country? The expression "all purchasers" does not mean the members of some association only, or 99 per centum of the purchasers of such goods, or those who would not thereafter buy such goods from someone else, but it does mean all of those who cared to buy such goods in such markets. This condition is not complied with by showing that the allowance of the "loyalty" discount was not, in fact, cancelled at any time. The language of the statute is "freely *offered* for sale." [Italics quoted.]

The truly comprehensive scope of the expression "all purchasers" is not curtailed by the circumstance that a major portion of sales is made to a greater number of purchasers or to those of a particular class or category of purchaser. *United States* v. *Mexican Products Co.*, 28 C.C.P.A. (Customs) 80, C.A.D. 129; *United States* v. *Glanson Co.*, 47 C.C.P.A. (Customs) 110, C.A.D. 740.

While it does not appear that the term in question has been considered in connection with an area restriction, such as obtains in the

present case, it seems clear that goods are not freely offered to all who care to buy them at any lower prices than those which are offered to purchasers in the least-favored locality. Since American purchasers in Puerto Rico are unable to buy Mexican sisal twines at the same prices as American buyers resident within the States, the prices to the latter class of purchasers are not the prices to all. Regardless of the elements which establish a class or category of purchasers, it is the price to the least-favored class to whom the merchandise is freely offered in the usual wholesale quantities and in the ordinary course of trade which determines statutory export value. *United States* v. *Glanson Co., supra.*

Since the record shows an actual sale to Puerto Rico during the period of exportation, and an acknowledged price list for offerings by other manufacturers of similar merchandise to purchasers in Puerto Rico, it is immaterial that the manufacturer of the instant merchandise ceased doing business with Puerto Rican buyers after the last of the importations here involved. The only sales which are relevant to a consideration of export value are those occurring at or about the time of exportation. *United States* v. *New York Merchandise Co., Inc.*, 31 C.C.P.A. (Customs) 213, C.A.D. 274.

Based upon the foregoing considerations, the court is of opinion that export value, as defined in section 402(d) of the Tariff Act of 1930, is the proper basis for the determination of the value of the merchandise covered by the involved appeals for reappraisement and that such values were those returned by the appraiser.

Accordingly, the court makes the following findings of fact:

1. The merchandise covered by the instant consolidated appeals for reappraisement consists of unoiled sisal twine and rope of varying plies, diameters, and fineness.

2. Said merchandise was exported by Cordeleria de San Juan, S.A., of Merida, Yucatan, Mexico, during the period between February 23, 1954, and July 20, 1954, and entered at the port of New York at the invoiced unit prices, less certain undisputed nondutiable charges.

3. The appraiser advanced the invoiced unit values to accord with prices at which such and similar merchandise was freely offered for sale for exportation to purchasers in Puerto Rico, at or about the period of exportation of the instant merchandise.

4. The invoiced unit values represent the prices at which such or similar merchandise was freely offered for sale for exportation to purchasers on the United States mainland.

5. Puerto Rico is a possession of the United States, and merchandise imported into Puerto Rico is subject to all of the provisions of the Tariff Act of 1930.

6. Exportation to Puerto Rico is exportation to the United States. It is, therefore, concluded that:

1. Export value, as defined in section 402(d) of the Tariff Act of 1930, is the proper basis of value for the merchandise covered by the instant appeals for reappraisement.

2. That merchandise is not freely offered to all purchasers for exportation to the United States at prices which are not the same for all areas of the United States, including possessions not specifically excepted by the Tariff Act of 1930.

3. That the only freely offered prices to all purchasers for exportation to the United States are those held out to purchasers in the least-favored locality, which, in this case, were the prices offered to purchasers in Puerto Rico.

4. That the appraised values represent the proper export values of the various items of merchandise covered by the instant appeals for reappraisement.

Judgment will be entered accordingly.