(Reap. Dec. 10439)

JOSEPH TANOUS v. UNITED STATES

Entry No. 74.

(Decided on rehearing [Reap. Dec. 9817] February 5, 1963)

*Stein & Shostak* (*Marjorie M. Shostak* and *S. Richard Shostak* of counsel) for the plaintiff.

*Joseph D. Guilfoyle,* Acting Assistant Attorney General (*Samuel D. Spector, Sheila N. Ziff, Morris Braverman,* and *Bernard J. Babb,* trial attorneys), for the defendant.

JOHNSON, Judge: The merchandise involved in this appeal for reappraisement consists of bubble chewing gum, exported from Mexico on February 27, 1947. It was entered at 6.50 Mexican pesos per 100 tablets, plus stamp tax, and was appraised on the basis of the export value of similar merchandise at 8 Mexican pesos per 100 tablets, net, packed, plus 1.65 per centum Mexican stamp tax. Plaintiff contends that the invoiced and entered value represents the foreign and export value of the merchandise under section 402(c) and (d) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938.

This case is before the court pursuant to a motion for rehearing, which was granted on December 16, 1960. *Joseph Tanous* v. *United States,* 45 Cust. Ct. 599, Reap. Dec. 9878. When it was originally tried, it was held that export value was the proper basis for the determination of the value of the merchandise and that such value was the appraised value. *Joseph Tanous* v. *United States,* 45 Cust. Ct. 522, Reap. Dec. 9817. The court found that there was a foreign value for such merchandise at 6.50 pesos per 100 tablets, as claimed by plaintiff, but that the evidence was not sufficient to establish that *such* merchandise was freely offered for sale for export nor to overcome the presumption of correctness attaching to the appraiser's finding of an export value for *similar* merchandise higher than the foreign value of such merchandise.

According to the testimony of Joseph Tanous, the plaintiff herein, a written contract, dated January 31, 1947, was executed by plaintiff, representing Tanous Chicle Co., the buyer, and Pastor Bautista G., representing Chiclera Industrial Mexicana, S.A., and Armando Medina Alonzo, representing himself and Impulsora Agricola Industrial, S.A., the sellers. A copy of said contract with translations was received in evidence as defendant's collective exhibit A and plaintiff's exhibit 1. It provides that the sellers will manufacture chewing gum of certain qualities and types and sell it to the buyer exclusively, except for (1) chewing gum destined for consumption in Mexico, (2) 50 tons which could be sold to Pan American Supply Co. of Mexico, and (3) partly processed chicle which might be sold to Cuban purchasers. The contract further provides that the buyer will advance

sums to be agreed upon for the processing of the product, which advances are to be paid by means of deductions on the amount of the sales made to the buyer. Fifty thousand dollars were advanced at or prior to the signing of the contract.

Under this contract, no export value can be found, since said value must be the price at which the merchandise is freely offered to all purchasers, not to one exclusive purchaser. *United States* v. *Mexican Products Co.*, 28 CCPA 80, C.A.D., 129; *D. N. & E. Walter & Co.* v. *United States*, 38 Cust. Ct. 634, Reap. Dec. 8790. However, plaintiff claims that the contract was never put into operation or was canceled prior to the exportation of the within merchandise; that this purchase was made pursuant to an oral agreement; and that the seller freely offered the merchandise to all purchasers at 6.50 pesos per 100 tablets.

Evidence as to the cancellation of the contract was presented at the original hearing, but this court held:

* * * On this point, plaintiff's testimony is not convincing. He admitted that the contract existed as to many things, including the price. He did not produce any writing canceling the contract. He stated variously that a new oral contract was entered into within a few days after the written contract was signed; that the contract was canceled within a month; that it was canceled the first week in March; that it was canceled in February or March; that he could not state whether it had been canceled in April. On the other hand, Mr. Medina stated in June to the Treasury representative that he was contemplating taking legal steps to rescind the contract. There is no evidence, other than unsupported statements of plaintiff and of Pastor Bautista, that any offers or sales for export were made to anyone other than the plaintiff prior to May 1947. The merchandise involved in this case was exported from Mexico on February 27, 1947. The weight of the evidence indicates that the contract had not been canceled at that time.

The court held, further, that even if the contract had never become operative, the evidence was insufficient to establish an export value for such merchandise at the time of exportation, on the ground that the statements of the witnesses that such merchandise was freely offered for sale to all purchasers were mere conclusions unsupported by evidence relating to actual sales or offers for sale.

Plaintiff has now presented additional evidence by way of affidavits in support of his claim that the contract had been canceled or had never become operative and that the merchandise was freely offered for sale for export to the United States to all purchasers at the time of exportation at 6.50 Mexican pesos per 100 tablets, plus stamp tax.

Pastor Bautista G., who had been a party to the original contract, stated that the written contract was not formally canceled in writing but that, about 10 days after signing, the manufacturers received a letter from plaintiff stating that he could not advance the necessary funds under the contract; that this letter was regarded as notice

that the contract would not be complied with; and that the parties, accordingly, agreed not to be bound by certain provisions, namely, the clause restricting the sellers from offering the merchandise to other purchasers in the United States, and the clause requiring the purchaser to advance further sums to the sellers.

Mr. Bautista stated, further, that the manufacturers did not restrict Pan American Supply Co. in any way as to the disposition it might make of the gum it purchased. He added that he had been present at the factories of the manufacturers during the first 6 months of 1947 and knew that bubble chewing gum was being freely offered for sale at 6.50 pesos per 100 pieces to persons calling at the place of business seeking to purchase gum for export to the United States and to persons inquiring by mail. Copies of letters written offering said gum for export were not available, because Mexican law requires that records be kept for only 5 years.

By affidavit, Emilio Perez Rivero testified that, in 1947, he was assistant cashier and assistant manager of Credito Internacional, which bank handled all financial transactions for Chiclera Industrial Mexicana, S.A., and Impulsora Agricola Industrial, S.A. He stated that said manufacturers had borrowed funds from Credito Internacional to finance their operations; that, in 1947, they had bubble chewing gum in stock which they could not sell readily; that, to assist them in liquidating said stock, the deponent made two or three trips to the United States in the early part of 1947 to look for purchasers. One of these trips was made in March 1947. On said trips, deponent visited various cities in the United States, including San Antonio, Houston, and McAllen, Tex. He arranged for some sales to one Cecil R. Haden in Houston in 1947, but did not recall the dates. The price at which the gum was offered was 6.50 pesos per 100 tablets and, on one occasion, in desperation, at 6 pesos per 100 tablets.

Louis Frank, an exporter in Mexico City, stated that he recalled that, between February 1 and June 30, 1947, Pan American Supply Co. was handling gum manufactured by Chiclera Industrial Mexicana, S.A., and/or Impusora Agricola Industrial, S.A. Affiant did not purchase bubble chewing gum produced by these manufacturers, but he helped Mr. Medina send out offers to many prospective buyers in the United States and Europe. The offering price was 6.50 pesos per 100 pieces.

Felix Templada, assistant manager of Pan American Supply Co., testified by way of affidavit that, during the early part of 1947, Chiclera Industrial Mexicana, S.A., offered his firm chewing gum for export and that, on that basis, the firm contacted several companies in the United States. Deponent stated that, as far as he could remember, the price was around 6.50 pesos per 100 pieces, but he did not recall whether any sales were made. The price was dropping in the United

States, and it was difficult to make sales and find buyers, although efforts were made during 1947.

M. S. Cowen, president of M. S. Cowen Co., stated in his affidavit that, in 1947, his firm purchased 120,000 tablets of bubble chewing gum, Chiclines brand, manufactured in Mexico. To the best of his recollection, it was not purchased from the manufacturer but from an exporter-importer which he believed to be Pan American Supply Co. His dealings were through Louis Frank who was acting for the exporter. The purchase was made early in May 1947 at 6.50 pesos per 100 tablets. The purchaser was free to sell the same in the United States or for export, but, as the market for bubble gum in the United States was overstocked, it was ultimately exported.

It was stipulated at the original trial that the merchandise had been appraised on the basis of the export value of similar merchandise, "Ace" brand bubble chewing gum, manufactured by Hercip in Monterrey, Nuevo Leon, Mexico.

Plaintiff has now presented an affidavit of Cipriano Garza Elizondo, who had been in the business of manufacturing bubble chewing gum in 1947 under the firm name Chicles Hercip in Monterrey, Mexico. According to the affidavit, his firm had sales offices only in Monterrey and did not offer its product in Mexico City. It is stated also that the Ace, Calvert, and Paris brands of bubble gum manufactured by Chicles Hercip were shipped for exportation to the United States only to Andrew J. Paris and were not offered for exportation to any other buyer.

While it would appear from this affidavit that the "Ace" brand of bubble chewing gum could not properly be used as a basis of appraisement, since it was not freely offered to all purchasers for exportation to the United States, even if the appraiser's action is erroneous, it is incumbent upon plaintiff to establish that there was an export value for *such* merchandise and what that export value was. *Kobe Import Co.* v. *United States*, 42 CCPA 194, C.A.D. 593. In order to sustain his burden, he must present evidentiary facts and not mere conclusions. *Brooks Paper Company* v. *United States*, 40 CCPA 38, C.A.D. 495; *Kobe Import Co.* v. *United States, supra; United States* v. *Baar & Beards, Inc.*, 46 CCPA 92, C.A.D. 705; *United States* v. *North American Asbestos Corp.*, 48 CCPA 153, C.A.D. 783.

The ultimate fact to be established here is that, at the time of exportation of the within merchandise, such merchandise was freely offered for sale to all purchasers in the usual wholesale quantities and in the ordinary course of trade for exportation to the United States at 6.50 pesos per 100 tablets, plus tax. As part of his proof, plaintiff must show that the contract restricting the sales to the plaintiff had been canceled at the time of exportation. In support of this proposition, plaintiff has presented the affidavit of Pastor Bautista G., which

states that a letter received from the plaintiff about 10 days after signing was regarded as notice that the contract would not be complied with and that the parties agreed not to be bound by certain provisions, including the clause restricting the seller from offering the merchandise to other buyers.

This affidavit does not resolve the confusion in the record previously made, but rather adds to it. While Mr. Bautista indicates that the sending of the letter was initiated by the plaintiff and took place 10 days after the signing of the contract, Mr. Tanous testified that a letter canceling the contract was sent at the request of the seller at an uncertain date in February, March, or April. Moreover, the Treasury representative's report (defendant's collective exhibit B) states that the contract itself was filed in accordance with Mexican law on February 11, 1947. It seems unlikely that the contract would have been recorded had the parties agreed at that time that it be canceled.

As noted in the previous decision, Mr. Medina stated to the Treasury representative, in June 1947, that he was then contemplating taking steps to break the contract. In support of this statement, there is attached to the report a copy of a letter from Chiclera Industrial Mexicana, S.A., to The Quality Plus Company, dated May 10, 1947, stating:

\* \* \* Due to "Chiclines" being patented by one of our buers [*sic*] in USA, we can give you our other brand "SCOUT" which is exactly the same or any brand which you might want to establish yourself, with no extra cost.

This is an indication that Chiclera did not feel free to offer the Chiclines brand to other purchasers at that time.

Although the Treasury representative's report is an unsworn statement, it is not for that reason necessarily entitled to less weight than statements in the affidavits submitted by plaintiff. *W. X. Huber Co., a/c D. A. Holm, Inc., et al.* v. *United States*, 26 Cust. Ct. 632, 636, Reap. Dec. 7982; *Heller, Deltah Co., Inc., et al.* v. *United States*, 24 Cust. Ct. 595, Reap. Dec. 7819, affirmed 39 CCPA 101, C.A.D. 471; *United States* v. *Humphrey & MacGregor, Inc.*, 44 Cust. Ct. 795, A.R.D. 122. In the instant case, the Treasury representative's report was made in July 1947, a few months after the transactions and prior to litigation, whereas Mr. Tanous' testimony and the affidavits were made years later after the case had been on the calendar many times. Under such circumstances, the statements in the report are entitled to greater weight.

The conclusion I reached previously that the evidence failed to establish that the contract was canceled on or before February 27, 1947, has not been changed by the additional affidavits presented.

Even if it be assumed that the contract was not in operation at the time of exportation, the record must show that the merchandise was being freely offered for sale to all purchasers on that date. On this point, the evidence is extremely vague.

The only sale established definitely is the one to M. S. Cowen Co., in May 1947. According to the Treasury representative's report, this sale was made with plaintiff's permission. Whether it was or not, it is too remote from the date of exportation to prove that the merchandise was being freely offered to all purchasers at that time.

The statement of Emilio Perez Rivero as to a sale to Cecil R. Haden has no probative value, since the witness could not recall the date thereof.

While there are general statements in the affidavits of Messrs. Bautista, Frank, Perez, and Templada that bubble chewing gum was offered for sale for exportation to the United States by the manufacturers or by Pan American Supply Co. during the first 6 months of 1947, no specific offers to any named person or firm on any specific dates were mentioned by the affiants. None of the affidavits is supported by records, and all were made many years after the events to which they relate.

In *United States* v. *Baar & Beards, Inc., supra,* an affidavit of the manager of the seller stated:

* * * On April 16, 1953 silk scarves identical with those shipped were freely offered for sale and were sold to all persons in Tokyo, Yokohama and Kobe, the principal markets of Japan for the sale of such merchandise for exportation to the United States at $2.85 per dozen F.O.B. Yokohama, * * *.

In holding that this affidavit was insufficient, the court said (p. 96):

The quoted statement was made September 30, 1955, more than two years after the events to which it relates, was not supported by any records, and obviously represents merely the conclusions of the affiant. No information is supplied as to the facts on which such conclusions were based, nor does the witness identify a single actual sale or offer for sale on the date in question in any one of the three markets to which he refers. In the *Brooks, Kobe,* and *Fisher* cases, cited above, this court held that such statements of conclusions do not constitute substantial evidence sufficient to overcome the valuation fixed by the appraiser, and no reason appears for reaching a different result here. On the contrary, it would appear that the rather complex and somewhat devious nature of commercial transactions in Japan during this particular period, involving, among other things, delayed rebates in Japanese currency, would make it especially important that facts, rather than conclusions, should be established.

By way of contrast, in a more recent case, *United States* v. *North American Asbestos Corp., supra,* the court stated (p. 157):

A declaration of the ultimate fact in issue here would be: Cape Asbestos Company's blue asbestos yarn is not freely offered for sale in England, in wholesale quantities, to all purchasers at any uniform price. While the affidavit concludes with what is, in effect, such a statement, the sufficiency of the affidavit is not to be judged on that final statement alone. Mr. Grant tells us, in addition, about a number of *facts* concerning the sale of blue asbestos yarn, that it is sold to the Crossley and Beldam companies and at two different prices, an unpublished list price to one and a price 19% less than that to the other, that others can buy it only at a still different and higher price which is negotiated in each

instance by bargaining. These are not mere conclusions. They are business facts which, if sent to a jury, would, we think, justify a verdict that Cape Asbestos Company does *not* freely offer the merchandise at bar for sale at any uniform wholesale price. It was not necessary, in this case, to prove anything else. [Italics quoted.]

In the instant case, because of the fact that a restrictive contract had been signed on January 31, 1947, and because the evidence is inconclusive as to the date of its cancellation, it is imperative that the record present *facts* showing that the merchandise was being freely offered to all purchasers on the date of exportation, February 27, 1947. While the affidavits make general statements about offers in the early part of 1947 or the first 6 months of 1947, none of the witnesses identified a single actual sale or offer for sale on the date in question. The only actual sale was made in May. Mr. Perez mentions a selling trip in March, but does not indicate whether it was at the beginning or the end of March. Under the circumstances of this case, more definite evidence is necessary to establish that the merchandise was being freely offered to all purchasers on the date of exportation.

On the record presented, I adhere to the conclusion previously reached that the evidence does not establish that the contract was canceled prior to February 27, 1947, nor that the merchandise was freely offered to all purchasers for exporation to the United States on that date.

Since plaintiff has not sustained his burden of proving a value for the merchandise other than the appraised value, that value must be affirmed.

On the record presented, I find as facts:

1. That the imported merchandise consists of "Chiclines" brand bubble chewing gum, manufactured by Chiclera Industrial Mexicana, S.A., exported from Mexico on February 27, 1947.

2. That such merchandise was entered at 6.50 Mexican pesos per 100 tablets, plus stamp tax, and was appraised at 8 Mexican pesos per 100 tablets, net, packed, plus 1.65 per centum Mexican stamp tax.

3. That the appraisement was made on the basis of the price of similar merchandise, "Ace" brand bubble chewing gum, manufactured by Chicles Hercip in Monterrey, Nuevo Leon, Mexico.

4. That such merchandise was freely offered for sale for home consumption in Mexico to all purchasers in the principal markets of Mexico, in the usual wholesale quantities and in the ordinary course of trade, at 6.50 Mexican pesos per 100 tablets.

5. That such merchandise was not freely offered for sale to all purchasers in the principal markets of Mexico, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, at or about the time of exportation of the instant merchandise.

6. That the evidence presented fails to establish a value for this merchandise other than the appraised value.

I conclude as matters of law:

1. That the export value, as that value is defined in section 402(d) of the Tariff Act of 1930, is the proper basis for the determination of the value of the merchandise involved herein, the foreign value being lower.

2. That, inasmuch as plaintiff has failed to prove a value for the merchandise other than that found by the appraiser, by operation of 28 U.S.C., section 2633, such value is the value of the merchandise.

3. That such value is 8 Mexican pesos per 100 tablets, net, packed, plus 1.65 per centum Mexican stamp tax.

Judgment will be rendered accordingly.